I think the first point I want to make is that I think the biggest problem that we have with this motion for summary judgment ruling is that the judge did not follow the rules relating to summary judgments. For example, he did not give all reasonable inferences on the facts to the appellant. He actually gave all inferences of facts to the respondent. So, for example, when he found out, when he determined that the store did not carry the type of jewelry that my client was looking for, that was based on their denial that that was the case and they ignored his testimony where he said, I saw it, that's why I stopped. I was admiring it in the case. There were other examples where they gave their, gave their references to the respondent. I mean, it was a little, I mean, he said, I saw a diamond, sometimes, at some point he said he saw a diamond necklace. He never exactly said he saw a man's diamond necklace. On the other hand, they never, as I understand it, they certainly never brought in any concrete evidence that they didn't have this and they said they did have some kind of diamond chains. Correct. They, they. So, here's my question. Did Diaz ever say to him, we don't have that? Is there any record that says we do not have diamond chains? No, and that's one of the points that I made. No, he actually never testified that he did. There's zero evidence anywhere on the record that Mr. Diaz ever stated to the, to Mr. Nakawamo, you know, gosh, I wish we could help you. We don't carry them. Let me show you something else, maybe that's similar or maybe we can fabricate something similar. So, the comment about putting diamonds in an existing gold chain, that might follow, if he had said it, a denial that we have that, that jewelry, but he did not do that. He never did that, and I think that's one of the reasons why the fact that the judge has accepted later on, you know, in a declaration, we don't carry that. I believe Ms. Rock, he said that. There was also some testimony about chains versus diamonds. So, for example, they said that we don't carry diamond chains, and then later on, they admitted, well, we do, we actually carry tennis bracelets. What I meant was necklaces, but what he meant is not what he said, and I think what we have here is we have to look at the record. This is summary judgment. What was said, what does the evidence say, what was before the judge when he was trying to determine whether there's a dispute of facts, and the dispute of facts is that Mr. Inocuomo says, I was walking by, I saw jewelry that I was interested in, in the cabinet, that is why I stopped. I was admiring it at the moment when Mr. Diaz asked me if he could help me, and I said, yes, I'm interested in seeing these diamonds. And if he had said, oh, those are actually our necklaces, we don't have them, I wouldn't have. He might have walked on. I mean, he was just, you know, browsing around the jewelry store. He went to another jewelry store later and looked for a Rolex. He wasn't looking for anything in particular. He saw something that caught his eye, I'm kind of interested in this, this is what I'd like to see. So, again, when you point to the overall universe of the evidence that was before the court, it was error for the court to say, they didn't carry that. He didn't fail to serve Mr. Inocuomo because they didn't carry the type of jewelry that he wanted. That is resolving the disputed facts in the respondent's favor, I'm sorry, in the defendant's favor, which he's not allowed to do on summary judgment. And that's not the only example. When we talk about the failure to serve, the, he was kept outside. He was kept outside the entire time. Now, yes, there is some geographic explanation for that, the way the store is set up. You've got the column in the corner, you've got cases. But there was no dispute that there were display cases inside the store. And there's no dispute anywhere on the record that Mr. Inocuomo started to walk towards entering the store and was stopped. He was stopped by Mr. Diaz, who said, stay outside, go around and come over here to this other display case that had jewelry that he was not interested in seeing. It had nothing that he was remotely interested in seeing. So, what is the motivation behind Mr. Diaz's conduct? Well, the judge said, well, there's no evidence of racial animus. Well, racial animus, very few people wave the racist flag and just admit, I'm a racist. You know, I use the n-word regularly. Nobody does that. You know, in fact, most people who are racist think that they're not racist. You know, they deny it. I believe in Black Lives Matter. So, how do you prove racial animus in a discrimination case? Well, just like in employment cases, it's circumstantial evidence. We look at the totality of the facts. What happened here? Well, what happened here is we have somebody who kept him outside, who grossly exaggerated his size to make him sound big and scary and foreboding, who changed his story three or four different times to not only his own co-workers, but to the police and to the insurance, the risk management. Even in writing at his deposition, he admitted his own written statement to Mr. Leeson was not correct. That's his own handwriting. So, this isn't the case of the police, you know, writing something down wrong or, you know, recollecting his statement. This is his own hand, and he wrote a version of events that was false. And we also have him talking hip-hop and mocking his accent. You know, it used to happen in movies a lot. Can I ask you some questions about the defamation? Yes, please. So, as to the statements to mall security, my understanding is that Roepke testified that the store calls mall security to go find the suspect and run after them. And I'm wondering why that isn't related to helping the police in a way that would be privileged. Well, that actually wasn't Ms. Roepke's testimony. When I asked Ms. Roepke, what is the purpose for calling mall security? Because I had already uncovered by that moment that it wasn't for purposes of calling the police. They do that directly. She basically said, I don't know, maybe for purposes of running after them and chasing it. It was pure speculation. If you read the testimony in context, she literally had no idea why mall security is called. Isn't it logical that it is to help catch the person? I mean, in this instance, it seems like the police got there first. But in general, wouldn't mall security sometimes be helping the police? I don't know if in general mall security, I don't even know if they're authorized to help the police in that manner, if they have the ability to detain. It could be that there's a contractual obligation. When you're a tenant there, you always report a crime so they can take steps to improve mall security. There's so many different reasons why the mall security might have been called. Roepke didn't know, and it's their burden because they're the ones who are saying it's a privilege of communication. It was not my burden to dispel all of the many things I could think of of why you might call mall security. It was their obligation. If they're going to say this is a privilege of communication, they need to basically say, and this is why, because our protocols say we call mall security for this purpose. And we did, in fact, call mall security for this purpose. There was no evidence of any kind submitted by the defendant as to why the mall security is called, except that Roepke said, it's what we do. This is what I was told to do, so I did it. I don't know what the mall security is supposed to do. The information issues, I have basically two concerns. One is the, whether your client was identified in a way that people wouldn't know who he was. He was certainly identified, you know, physically in some detail in at least some of these. So not in the statement of the employee who called her her husband and son or something. She basically didn't have any description, as I understand it. So I don't know how that would trace back to him. Well, Ms. Roepke just tried that she went home. And I believe, I can't remember if she told her husband or her father. I apologize, I can't remember. She also said she told her friend, Brooke. So I believe that's what you're referring to. And that particular testimony, she didn't recall her exact words, but she said that somebody stole from the store today. Now if you say that, the person who's speaking with knows what store she works at. She basically gave the date, and she explained what the crime was. So the standard is ascertainable, not that he has been ascertained. So the circumstances. You can look up the police report. You can look up the police report. I mean, if you're going to look up the police report, you're going to see the facts. And if you don't look at the police report, you don't have something that identifies your client. So I don't know why this statement is really on its own defamation. The statement on its own is defamation because it's false, and it's about Mr. Nakawomo, and it's a statement of fact. So that is why it is defamation. Whether or not it was published to somebody who could ascertain his, the fact that somebody chooses not to ascertain it doesn't take away from its defamatory character. The point is that somebody could, right? We're also talking about a celebrity. Somebody wanted, for example, to dig up dirt on Mr. Nakawomo. The SDV case about the husband and wife who own a corporation, and that corporation is named. I mean, someone could look up who the people are who own that corporation. Why does that case not stand against your principle? Well, because that case, they didn't make defamatory statements about an individual. They made defamatory statements about the company. And the argument in that case was that the defamatory statements weren't about you. Just because you're an officer, officers and directors are separate from the corporation. That is, in fact, basically what corporation law is, that they're separate. So if they're talking smack about the company, I hate this. But doesn't our court talk about whether it identified the individuals? I mean, you may be right about other issues in the case. No, the issue was, is that somebody reading the defamatory statement would not have identified that it was about the individuals, because on its face, it was about the company. The question is what individual? It's what? What individual? It's not even just that. It's that the statement itself wasn't about an individual at all. So about ascertainability, you couldn't ascertain that it was about the officers and directors, because there was no reason to think it was. The statement itself was about the company. And so that was the issue in that case. It wasn't that they made a statement about the people who run the company. The people who run the company are crooks. Now, that's different. If the statement was the people who run the company are crooks, and you're like, hey, we're the two people who run the company, and you can ascertain us because we're on the Secretary of State website, I would agree that that is this case. But that's not what that particular case said. That particular case, the reason that they were not ascertainable was because it wasn't about them. On its face, it wasn't about them. Nobody would think it was about the officers or directors or the people that ran the company. It was about the company itself. And what about the other store, the jeweler? What you have there is a statement that someone had talked to them, and, you know, some evidence that someone had talked to them, because they had very specific information, which they put in there. Right. But the person who said she knew who talked to them then said, well, I don't know if she talked about this. Well, that's the thing. So, when you look at the one sentence, it's one sentence that we chop apart. I asked Ms. Rocky, did she tell you that she told them that plaintiffs stole the necklace or stole a necklace? And she said, oh, yes. She said, oh, yes. Pause. Well, I actually don't know. So, I say it's for the jury to decide. You've got a conflicting statement in and of itself. Does the jury believe her when she first, her initial knee-jerk response, oh, yes, that's what she said? She did talk to these people that we know. We absolutely know that. That they had a lot of very specific information. And we absolutely know that as well. Information that they wouldn't have had from their own perception of seeing him in the mall and him having walked into their own store. So, this is why it's the circumstantial evidence of the content of the defamatory statement. Because clearly they have information that Mr. Nakawamo was accused by the store of stealing a very specific necklace in a very particular way. That only somebody at the store or somebody with knowledge of that information could have shared with them. We've got Rocky's admission that Fern did speak to the store. And we've got Rocky's initial knee-jerk admission that that is what Fern told them. Before later on in the same sentence, maybe five seconds later, it's hard to tell the pauses on a transcript where she recanted the same testimony she had literally just given. And this is what I say when I say the judge didn't, you know, he made the facts in the defendant's favor. Well, why do we agree that it's the latter half of the statement and not the first half of the statement that governs this case? Isn't that for the jury to decide which part of her statement is truthful? And, you know, quite frankly, in conjunction with the other information, circumstantially it is very, very apparent that Fern probably gave all of these details to Kevin Schollers. So looking at SDV, it says, they contend that their reputations were so closely associated with a small corporation that any statements defaming the company regarding its financial problems would necessarily reflect on their reputations. We need not resolve this question, however, because there is an independent ground to support the district court's decision to perceive of their suit as individuals that met this must show not only that the statement could reasonably be understood as referring to them as individuals, but also that some third party understood it that way. And that's what the court resolves it on. So I don't think you're right that it's about, your answer doesn't match what I'm reading here. Well, the issue is that last factor about whether a third party associates them with Ashley Bain is only when the target is ambiguous. If you look at all of the cases that cite that additional requirement, it is all cases in which the target of the defamation is ambiguous. It's ambiguous here who your client is. It's someone wearing these clothes with dreadlocks or whatever. That is ambiguous. You could look it up in the police blotter, but these people could have looked it up by looking up who owns this corporation. I understand the point that you're making. I don't think it's applicable here because there's no dispute that the statements were about Mr. and Dr. Loma. In that case. But these people were definitely the owners of this company. There's no dispute about that either. No, there isn't. But if you go back to the statement that was made itself, the statement itself wasn't about the owners of the company. It was about the company. They're saying that they're so closely associated that they should be considered as. I think you're right. It's just the court happens to have not decided it on that ground. So I think it's a problem for your argument about looking things up somewhere else. I think that's one of the cases where we're talking about when the target of the defamation is ambiguous, either because it is directed towards a group of persons and your person is one of them or it's directed to an unknown, you know, like an entity in that case, it is directed towards something that isn't actually a person. In this case, it was directed to Mr. and Dr. Loma. Nobody has disputed that any of these statements. I wasn't talking about him. I was talking about the other guy that came in and stole a chain earlier that same day. Nobody has said that. And if somebody did want to look up the statement about the corporation, then they could have. And there's also other cases which talk about this identified by a third person. You don't actually have to have evidence that an actual third person heard the statement and said, aha, I know who they're talking about. For example, I cited the. I think you're over your time. So, why don't we give you a couple minutes for rebuttal, but hear from the other side. Thank you. Good morning, Your Honors. Jenny Klawe, appearing on behalf of Defendants Appellate, Sterling Jewelers, Incorporated, and Arnulfo Diaz, who is an employee of Sterling, who also does business as case. So, the first thing I would like to do is to correct a record fact. I would like to point you to excerpts of record 442 and 443, where there's clear testimony that I'll read the specific passage. When he, on a call, asked for diamond chains, what did you say? And this is the deposition of Diaz. Diaz says that we do not carry them in the store. Question, was that true? Answer, that's true. And then on the next page, at record type 443, Ms. Coleman continues the questioning. So, after you told Plankton that you did not have what he was looking for, what happened next? And that goes on to the testimony about showing the gold chains of trying on. So, there is clearly, but what was Plankton's version of that? The Plankton did not, there were no questions specific to what Diaz had told him about whether or not there were diamond chains. It's pretty clear from the record, there's a little bit of miscommunication. Some of the statements were kind of by implication. So, when Onokuomo says that he was kind of told to stay outside the store, it's not clear there was a direct statement of stay outside the store. What Onokuomo testified to is that's kind of the gist, the concept of what he took from Diaz's words and tone, but there's no clear statement of stay outside the store. So, as far as this diamond chain goes, Diaz actually says, Onokuomo asked for diamond chains, and then I think there was a motion, and so Diaz understood that to mean he was looking for diamond chain necklaces, which turned out to be correct, because in his deposition, Onokuomo admits he was only looking for solid diamond chain necklaces. So, the only evidence in the record is that Diaz did tell Onokuomo, we do not carry diamond chain necklaces, and then he started showing him gold chain necklaces, and then the next step of that was Diaz offering Onokuomo, well, understand that he wanted diamond chain necklaces, maybe we could give you diamonds and these gold chains to get you what you want. Onokuomo was not interested, and he left the store, and so the important framing of the UNGRA Act claim is that the facts that are relevant to this claim begin when Onokuomo approaches the store and ends when Onokuomo decides he's not interested in what's being shown and leaves the store, and as far as the gist, his understanding. Let's go back to what the plaintiff testified to. He said that he got there, and he was trying to, Diaz was trying to be a good customer, a guy, and tell me something he didn't want, and he asked me to go over, and he started saying, oh, I know what you want, I know what you want, you know what you want, don't worry, I got you, and all that, and he brought out a piece, and he wasn't interested, well, that seems to preclude the notion that he said we don't have it. He said he was trying to talk him into something else, but he didn't say, I don't have it. I think there's, that is what Onokuomo says. That's how he started, that's how he started, I know what you want. Yes, so just because those are statements that Diaz made to him doesn't mean there was an additional statement not made of, we don't have diamond chain necklaces, so it could be a gap in the record. It's not necessarily true that Onokuomo's testimony is every little step of what happened in the store. We don't have him saying that Diaz never told him they don't carry diamond chain necklaces. All right, go on. What did he say? You told me it was, you told me it was, yes. What's the, what did he say in response to that? He, well, he asked me to go over to the side of the thing, and he started saying, oh, I know what you want, doesn't sound like there's a gap. What did he say? That's what he said. Right, I think because Onokuomo was specifically, or not Onokuomo, sorry, Diaz was explicitly asking Ms. Holman, did you ever tell him? The answer was a very explicit yes. That question was never posed to Mr. Onokuomo of, did he ever ask you, did he ever tell you that we don't carry diamond chain necklaces? And I think the most important gap of that is even ignoring the evidence that, it's a pleasant door for the minute that there's evidence that the store doesn't carry diamond chain necklaces. Pretend they do. They have them at the store. Mr. Onokuomo saw that. He was interested. He wanted to try it. He never told Mr. Diaz, wait a minute, why are you showing me gold necklaces? He said, I told him I didn't like it, I took it off, I don't want gold, I want diamonds. Yes, he said, I want diamonds, but he never told Mr. Diaz, this is what the district court picked up on. I see the diamonds I'm interested in, can I try those instead? Or letting Mr. Diaz know that he sees what he's interested in, beyond these gold necklaces, which he's not interested in. It seems like he described the interaction, though, as starting that way. Like he was at a case of diamonds, according to him, and that's where he started, and Diaz moved him, so, I mean, I don't understand how there's not at least a fact dispute about whether he communicated physically, if not verbally, that he wanted things in that case. No, the case that he saw, even in his own testimony, he was not clear what kind of diamonds that he thought he was interested in. He asked for a diamond necklace, and what Diaz had to say is, we don't have a diamond necklace, but according to him, Diaz didn't say that. He tried to talk him into this other thing. Right, but I think in addition to Diaz explicitly saying that, I told him, I do not carry diamond necklaces, the fact that he offered to set diamonds into gold necklaces is evidence that he tried to give Monaco, what he thought he wanted, which was diamonds sent into the gold necklace, or diamond necklace. That's how you create a diamond necklace. But if you thought that's, let's hypothesize a person who thought that, you know, why have a black guy trying on diamond necklaces because, or diamond bracelets, is because he's going to steal them, so, you know, if you put diamonds in a necklace, he has to have the diamonds until he makes the diamonds against the diamonds. So it's a different thing entirely. I did not consider that before. That's certainly a possibility, but I don't think that's borne out by the record here, which is that he let him try on, or he offered him to try on, even though Mr. Monaco was not interested in fairly expensive pieces of gold necklaces. And, I mean, there is, it is true, and I haven't been here a month to actually talk about this too much, but he has clearly changed his story five times. And the police dropped the case in three hours, basically, because they said that he was changing his story all the time. Yet within those three hours, much less before and afterwards. That is true. To make clear, the changes in his story is whether he physically saw Monaco, the main difference in the stories, is whether or not he physically saw Monaco take a ball up the chain in his hand, or that he turned around and it was gone, and he assumed it was. And whether he put it on the counter, or whether he put it on the mirror, and what he told his co-workers, or what he told his co-workers, and whether there was a, you know, a black guy by the stairs, or whether there wasn't a black guy by the stairs, and so on, and so on. Now, I suppose one response to it is, well, he could have been a thief, but he wasn't, it wasn't because the guy was black, he just decided to steal a necklace, I guess. Well, I think in this case, first of all, the necklace was kind of never found, you know, possibly a long way in history, we don't know what happened to the necklace. But in this case, it's also that the discrepancies, or the details, he said he was really scared, this is something that happened very suddenly, and so, I'm not a memory expert, I don't know. I'm just saying that he met a black guy by the escalator, or by the staircase, and the surveillance camera showed there wasn't one. So, I don't think it was that the surveillance camera didn't show that, he did say that did not happen in deposition, he said he didn't even tell that to the police, so it was in the police report, maybe somebody else had told him, I'm not clear on that, because it's not, I don't think it's relevant to any of the claims in this case, but he does say it's not what he told police. And then he told, he said at one point that he had, he told his co-workers, when the guy was like three feet away, and they seemed sure that there was a person inside, when he talked to them, I'm not sure which part of the record, but he said something like, well, I turned immediately to the co-workers and told them that that guy just took the necklace, when the guy, when, I can't tell you how long, how long, was, and he said she was three feet away, and then later he says a bunch of other things. I think what Your Honor is referring to is that Ms. Rock, he testified that by the time she heard Mr. Diaz say, I think he stole it, he's no longer visible from the store, and the store is very, I mean, Mr. Onokuo was on one side of the display case when he was trying his necklace, so it's not that surprising to me that within a few seconds he could have walked away. So to me that's not, that's not one of the discrepancies in Mr. Diaz's testimony. Certainly there were other discrepancies, specifically the one about whether he saw Mr. Onokuo take the chain or whether he was just gone. That could have been an assumption he made, that if it was in front of me and it's not the closest person, the only person there must have been Mr. Onokuo. So there, that was the main discrepancy of his testimony to police, and then a later statement and a later deposition of whether he saw that. Do you want to refresh the defamation question? Yes, I would love to move on to the defamation questions. The threshold question in the defamation claim, and I'll spend very little time on this, is the, an argument that was first made for the first time on appeal, which is a change in civil code section 47B, which no longer protects false police reports, false statements to police that identify police reports. I don't think the court should consider that because it's a first, it was first brought up on appeal, but more importantly, even to the substance, every district court that has looked at that statute has said it is not retroactive. It was effective as of January 1st, 2021, more than a year before these statements were made, and it's clearly not retroactive. They say to Corey v. Stowe, which is well settled California law, that unless a statute explicitly says it's retroactive. So let's assume you're right about that, but let's assume you're wrong about whether the call to mall security was privileged. Do you lose then on the call to mall security? Because I think the only argument you've made is that it's privileged. Yes, on summary judgment, if the call to mall security was not privileged, then we would lose on that part of the claim. So you're admitting it identified him well enough, and all the other elements that we need here. Yeah, so this is an interesting, these are interesting theories on liability for this because none of the real statements are in the record, because we know that somebody called mall security. Rob Key says that she told someone to mall security. Mall security must have been called because they came to the store, they were interviewed by police, they interviewed Diaz. We don't know exactly what was said. So we are giving appellate every, you know, possible, even if mall security was explicitly told. There's this person, the description that describes this person perfectly. Mall security understood it to mean an acquittal, and therefore tracked him down. So we don't concede that those elements were met, but we were assuming for purposes of this specific argument of privilege that we'll give them. And mall security tracked him down? Pardon? Mall security tracked him down? It's not clear from this record. It's clear that police were the ones who detained him. It's not clear from the record how mall security helped in the process of detaining him. But we do know that the only reason that mall security participated in the investigation, so mall security was called, interviewed by police, told police what Diaz had told mall security on one point when mall security questioned Diaz. And the only reason they went back to Diaz to further investigate was the discrepancy. There was a discrepancy of discretion, actually. Yes, exactly. So there was a discrepancy, the big discrepancy, was whether or not he actually saw it or not. But we take the gold chain, as they went back and interviewed Diaz. And so mall security was integrally involved in the investigation. Is there any evidence about when the store employees learned who the, oh no, what was? So only Rob Kee, Diaz were deposed as part of the employees. Rob Kee testified, they both testified they had no idea who he was at the time. Rob Kee said that she had found out a few months after the incident because somebody had brought in a copy of the Instagram post that Mr. Arnold Cuomo had posted on his Instagram. Kind of deep behind that. So that got publicized to the store, at least. So like the calls to family members that day presumably didn't name him? Correct. They didn't know his name. And she was like, I didn't describe him. So she had told, basically when she got home, she talked to her dad, who she lives with, and later, I think a few months later maybe, she called Brooke her friend. But in either case, she did not name them. She did not describe them. She just described the incident at work. I think one of the statements was there was a grab-and-go at work. So what about the ones that, well, first of all, Diaz talked to whatever relatives he talked to. I mean, this may be an artifact of the transcript, but it says, did you tell them that a plaintiff was stolen? And he says, yes, I told him. I mean, it seems unlikely that he actually knew his name. But maybe he did because he was the one who was interacting with the police. Maybe he didn't know his name by then. That's possible. That's not what's on the record. But he did say, I told him the plaintiff was the one who stole him. He answered yes to that question. No, I think he said that. Well, yes, he did. But is it clear from the record that when he answered the question was not asked, it comes with the name of the plaintiff? Whether it's his given name or his stage name, that it was only when she was answering the question she answered it in general. But yes, the plaintiff, because she knew he was being sued. I found that the question itself was ambiguous to me anyway. That's how I read it as well, where the question is, did you tell them about, it's almost like, did you tell them about this incident where a plaintiff stole something? And the answer was yes, not necessarily did you tell them that, Mr. Onocuomo, or even a description. I mean, any defamation that ran to the relatives was, I mean, in terms of damage, it's going to be ministerial anyway. It seems to me the important questions are the mall security, the e-mail blast from the store, and the others at the store. Yes, so maybe turning to the e-mail blast to the store, that's protecting Jim Royce, that's both privileged. Because it was eliciting additional, it listed the. And it didn't say anything about that, it just said we're just telling you about this. Right, but it also listed out the explicit phone number, the officer, the police report number. To me that invites, if there are additional problems, if you see someone coming back to the description, acting suspiciously, contact the police at this number. This is the person who has formerly detained him. So to me that's eliciting additional help for the police investigation. But in addition, it also doesn't describe Mr. Onocuomo in a way, unless someone goes and looks up the police report, that makes him ascertainable. And one thing I would like to point out is that SDV was right on this point, but also a little bit, not as clear as the plea cases it cites, where the clear case law is that the plaintiff must show the statement was understood by at least one-third person to have concerned the plaintiff. That is an additional showing beyond the of and concerning. So, and then one of these cases, I think it's Bartholomew versus U2, which we cite in our briefs, Neary versus Regents, but also SDV cites two cases that says this, which said to satisfy the publication requirement, the plaintiff must show the statement expressly mentions her or refers to her by reasonable implication. That's the first part. The plaintiff must also show the statement was understood by at least one-third person to have concerned her. If the name were actually used, would you have to show them? No, that would probably meet both of those factors, where it's by reasonable implication or it's. If nobody read the email, nobody read the email. Would that matter? If nobody read the email, then that would not meet the information. But if there was a publication. I don't think that would. And if Una Cuomo was the thief in this email blast, would you have to demonstrate that people actually read and understood? I think you would have to demonstrate that, but the case law says you don't have to necessarily demonstrate it through direct evidence. You don't have to call in someone to say, I heard the statement, I saw the statement, I understood it to be the plaintiff. It can also be done by circumstantial evidence. So one of the cases I briefed, an example was, this was a publication to millions of people. This was a, in that case it was not a celebrity, but it was a public persona, so a well-known persona. This went out to, you know, millions of people. This described him, so of course there are going to be some people who knew this was about this specific plaintiff. In this case, all of our statements, I mean some were made to directly one or two people, and there's nothing in the record showing that they knew it was Una Cuomo, and there's nothing in the record showing that it was describing him by reasonable implication. But also, this email... We have you way over your time, so are there other questions? I have one other question. Is there anything you want to say about the IAEA, the intention of the IAEA deflection claim? I know that you think that he didn't show enough injury, but aside from that, what else? Oh, I think the critical, first of all, the IAEA claim is in some ways derivative of the first two claims, because the outrageous conduct that Mr. Una Cuomo alleges is based on the same facts of the UNRRA Act violation and affirmation. So to the extent this court affirms summary judgment on those two claims, it must also affirm the separate judgment on this claim. But also, on the severity, the one probably most critical case is Hughes v. Spare, which is a 2009 case that postdates the cases cited by Mr. Una Cuomo, and it's a California Supreme Court case that explicitly holds that anxiety, just kind of general discomfort, and in that case, it was a sexual harassment case where an attorney was sexually harassed by her partner, and they said just anxiety, depression, that's not enough, even on summary judgment, to get you the hoop for the severity required for an IAED claim. Thank you. Thank you, counsel. We have gotten way over your time, so let's do five minutes for rebuttal. Thank you, Your Honors. Do you have any questions before I jump in to make a few more points? Okay. As you have the potential infliction of emotional distress, I take it that it's based on some sort of an outrageous conduct. The outrageousness is in part based on the fact that he has devised a scheme to steal the bracelet himself and to blame it on the plaintiff. What is this? Is that, would that render the corporate defendant liable in the California Respondent-Superior Law? Well, we're actually not making the argument that the outrageous conduct is Diaz coming up with a scheme to take the chain himself and pin it on Mr. Nakawomo. The IAED claim is based on the outrageous conduct of racially profiling Mr. Nakawomo as a thief and then publicly declaring him to be a thief. So, accusing him of a crime is the outrageous conduct. That's alleged. And it was clearly within the course and scope of Mr. Diaz's employment. It was, the chain belonged to the company. He was acting as a representative, as an employee of the company when all of this happened and when he made the accusation. And then the company ratified the accusation by Paul Easom when he sent out this email blast to every single store in the entire Southern California region. So, I don't think, they certainly didn't argue that to the extent Mr. Diaz's conduct was sufficiently outrageous that it would not have been imputed to the company. I don't see how they could possibly make that argument on this record given the fact that everything he did was in the course and scope. The statement that he made is the type of statement he would make as an employee when making a legitimate claim of theft. So, it's actually not something that was brief, but just about the top of my head. I don't see that the company could deny that it was acting as, that Diaz was acting as an agent. But even if they did, they've seriously ratified it since then by their conduct in this lawsuit. But that's as, as you clarified, that's as to the racial discrimination theory, not as to the framing for the crime theory. Right, but we're not, again, we're not, the framing of the crime is sort of, I think that's one of the things that we can take away from Diaz changing his story. But that's not the alleged outrageous conduct that we're hanging our hat on. The outrageous conduct is the false statement, the false accusation, and the racial profiling of Mr. Anacolama. I hope I answered your question. Yes, you did, and go ahead. Thank you. With respect to the IIED claim and the damages, Mr. Anacolama didn't just testify that he was upset, had anxiety, and some depression. He also has a fear of leaving the United States because he might not be able to come back and see his own son. He's got counseling from elders in Nigeria, people that he trusts. This isn't a matter of somebody who was, you know, sad, and, you know, maybe should have gotten over it in a couple days. This has had a long-standing impact on Mr. Anacolama, which he testified to. Can I ask one other question? I've got something else. The self-publication piece. Yes, thank you. The self-publication piece. The defendants tried to argue that the case that talked about the self-republication that apparently employment is the only context in which it's appropriate. And that happens to... But there is a foreseeability element to it. Where is that here? If they didn't know who he was? Well, I think that even if it's not a celebrity in this day and age, we can't just ignore the era that we live in and the circumstance we live in. This is an era of social media where youth are posting every thought they have throughout the day on social media for the world to see. We're in a situation of cancel culture where celebrities and other people, you know, people that go into Trader Joe's and make a fuss over a mask and call out a manager, and they're being canceled. That's an ordinary person, right? We're in a society of cancel culture and publication and people constantly telling... So does your republication argument not really depend on him being a celebrity? It does not depend on him being a celebrity. The self-republication is, if you're going to accuse somebody of a crime, it is foreseeable that that person is going to want to defend themselves and prove themselves not a criminal. It is 100% foreseeable that somebody's not just going to roll over and not fight for it if they're innocent. Who should have... Yes, it may have been the thief. Feed into that in the sense that if you were the thief, presumably it would be more foreseeable. I'm not sure. I'm not sure. I think it's just as foreseeable either way. For Diaz personally, if Diaz knew for a fact that he had the chain in his pocket, then yes, she would probably understand that the person he's accusing would certainly want to protest their innocence because he has the secret knowledge that the innocence exists. But beyond that, I don't think that it adds much extra because I think in this day and age, if you accuse me of a crime, Christina, you stole $100,000 from that bank, you're a thief. I'm not a celebrity and I'm going to say I absolutely did not steal $100,000 from that bank. Don't call me a thief. If you posted it on social media or I think that other people heard you or might believe it, like the people who saw me in the mall, I'm going to go to my Facebook page and I'm going to say the craziest thing just happened. I was accused of being a thief. I am not a thief. I'm a lawyer. I'm good standing with the state bar. This is outrageous. Not just because of social media, but because of the nature of the accusation, self-publication is expected for the exact same reasons for an employer. The types of things that were written in the file about that employee who felt the need to defend themselves to a prospective employer was about dishonesty and possible criminal activity. And that's what we have here. I think it's naive to think that somebody is not going to self-republish in accusation of a crime to declare their innocence. He did. And not only did he see people taking photos and videos, but he heard them shout out his stage name, which only somebody who knows him as a celebrity... No, he did. He was saying that even before he even went to 2K Jewelers, he heard people say, you know, I don't know if you've ever done that. You're at a bar. You see a celebrity. You're like, Brad Pitt. You want to see if he turns around in response to his name. That's basically what he testified had already happened and that is exactly why he went on Instagram because at least a couple of his fans were in the mall that day, the ones who recognized him and called out his name. I think we better stop now.  Thank you.
judges: BERZON, FRIEDLAND, Korman